May it please the Court, my name is Xavier Brandowain, Esquire, Sanders & Dempsey, on behalf of the petitioner, Mr. Salvador Gilberto Ponce. If it pleases the Court, I will reserve one minute of my argument time for rebuttal. Your Honors, asylum from persecution is one of the most valuable opportunities that this country affords to non-citizens. The Court should reverse the Board of Immigration Appeals' decision, which denied Mr. Ponce's asylum application. Could you pull the microphone closer? Yes, Your Honor. Is this better? Much better. Thank you. This Court should reverse the Board of Immigration Appeals' decision for two reasons. First, Mr. Ponce has established a well-founded fear of future persecution on account of his sexual orientation. And second, Mr. Ponce has also established that he was persecuted on account of his political opinion. Turning to the first round for reversal, the immigration judge erred by holding Mr. Ponce's asylum application to the wrong legal standard. In the proceedings below, Mr. Ponce was required to show that his well-founded fear was both subjectively genuine and objectively reasonable. Now, Mr. Ponce testified that he was verbally abused on account of his sexual orientation in El Salvador, and as a result was severely depressed and was traumatized. Now, the immigration judge specifically found, and the government does not dispute, that Mr. Ponce's credible testimony satisfied the subjective component of the test. The only issue, then, is the objective component and whether that was met. It was. In Inez v. Cardoza-Fonseca, the Supreme Court held that to show well-founded fear, an applicant did not need to show that it was more likely than not that he would be persecuted if returned to his home country. Rather, all that is needed is a reasonable possibility, which can be as low as a 10 percent chance, as the Supreme Court has held and as this Court held recently in Ahmed v. Kessler. Would you just cut to the chase? We have an odd situation where we have a rather opaque country report that talks about, I guess it's some instances, but the I.J. seemed to discredit the Human Rights Watch report, which had much more detailed and specific information about persecution and difficulties. What are we supposed to do in terms of that holding of the I.J.? Your Honor, it's not this — it's not the responsibility of this Court to reweigh the evidence, but this Court may hold that if the evidence and record would compel the contrary results, which in this case — Well, that's the sticking point. You know, if we take that seriously, what is compelling about his evidence? Give me the events that you rely on that are compelling. Yes, Your Honor. What's compelling, first of all, is that the immigration judge committed a legal error by holding — by requiring that Mr. — No, no. Tell me the events that are compelling. Don't tell me about the immigration judge. Just tell me what are these compelling events that make us say the I.J. is wrong? Yes, Your Honor. The compelling events are, first of all, the report by the organization called Entre Amigos, which means Between Friends. You're mumbling. Can you speak clearly and loudly into the mic? Pardon, Your Honor. There's an organization called Entre Amigos. Yes, and they exist. They're flourishing, as far as I can tell. They're threatened, but they exist. They don't — nothing terrible has happened to them. No, Your Honor. The fact that they exist does not undermine any likelihood or possibility of persecution on account of sexual orientation, nor did the existence of the NAACP in 1960s Birmingham, Alabama undermine any reasonable possibility that an African American might be persecuted on account of his race. Rather, the Entre Amigos report states that there are incidents of violence against homosexuals in El Salvador, such as — What are those incidents of violence? How many are there? Your Honor, the — how many is hard to quantify, but — Well, give me a number. I don't have a number. It's pretty few, if I read the record correctly. No, Your Honor, it's not very few. In fact, the 2001 Human Watches report stated that there's a campaign of terror and violence against homosexuals. What? There's a campaign of terror and violence against homosexuals. For instance, there are — And they name about — it seemed to me they named just a few cases. No, Your Honor. People can take a few cases and say it's a campaign, but we need a little objective evidence. Your Honor, the record is — the record indicates that homosexuals are routinely detained by national and civilian police for no reason, even though they're non-engaged in domestic violence. Once or twice, yes? No, Your Honor, it's not more than once or twice. If it were once or twice — Five or six, maybe? Much more than that, Your Honor. At least a 10 percent chance. That's why it's being characterized as — Really? You think there's evidence here of a 10 percent chance of being — Yes, Your Honor, it is. In fact, in Mr. Ponce's testimony, he testified that on a daily occurrence almost, he was always verbally mistreated in the street by being called faggot in the street. That kind of pervasive — What's his 10 percent chance of happening, Your Honor? I don't understand, Your Honor. Give me — you said something about — he said — what was his testimony that you thought was important? Your Honor, Mr. Ponce testified that he was always verbally mistreated in El Salvador, such as by being called faggot and otherwise verbally abused on account of his sexual orientation. That kind of pervasive conduct, which is condoned by the Church in El Salvador, pervades society in El Salvador and also — Could you maybe place this case for us of how does it fit with Bromfield and Caruni, where we did determine that there was such a possibility, at least 10 percent, of persecution on being returned to the country? Your Honor, I'm blanking, unfortunately, on the fact of Bromfield. But in this case, Mr. Ponce clearly established — We had a case in Jamaica. Maybe I should say it by country rather than my case name. How about the — you recall the case in Jamaica where we did determine — we found in favor of the petitioner? I don't, Your Honor. Okay. I apologize. Turning to the second ground for reversal, Mr. Ponce also established that he was persecuted on account of his political opinion. Now, the immigration judge held that he was constrained by the Supreme Court decision in Inez v. Elias Zacarias. About the political opinion, what is there in the record that shows that the guerrillas were aware of his political opinion? A few things, Your Honor. First of all, Mr. Ponce testified credibly in the record, pages 686, 693, and 694, that he does not believe in violence, that he purposely refused to associate himself with any organization that was remotely involved with violence, and therefore that he was a pacifist. Now, Mr. Ponce's friends, or former friends, joined the same guerrilla group that attacked and beat Mr. Ponce, leaving him physical scars. Yes. But what is there in the record that shows that they were aware that he was a pacifist? Your Honor, in a small community like Delgado, El Salvador, where two people are friends and one has political beliefs, such as Mr. Ponce, it's reasonable to infer that his friend would know those beliefs. Moreover, this court explicitly held in Songers' INS that a political opinion can't just be to be politically neutral. An environment where to do so — No, that's not the question. I assume that if they were aware that he was a pacifist, then we get down to a different question. Then we get down to was that a motive or was it a part of a mixed motive. But the first step has to be that they're aware that he is a pacifist. And I'm trying to find in the record where it shows that they were aware, not that they were pacifists, but that they were aware that he was a pacifist. Your Honor, they can either be aware that he is a pacifist on the basis of their former friendship with Mr. Ponce and the fact that they knew of his political beliefs, or they can impute it to him, which is also an indirect or circumstantial way of proving the causation needed between the persecution and the political opinion. Now, this court held in Songers' INS that to be politically neutral, an environment where to do so is fraught with hazard, can constitute persecution on account of political opinion. That's exactly what happened here. Mr. Ponce refused to join the guerrillas, and the guerrillas imputed to Mr. Ponce an opinion that he was wanting to distance himself politically. Now, the court also held in Songers' that something more is required to bring this case out of an Elias Zacharias type situation, and that something more is his affirmative belief in pacifism, his belief against violence. You have one minute left. I see I do. I'll reserve that minute for rebuttal. Thank you. May it please the Court. Rebecca Hoffberg, on behalf of Respondent, the Attorney General. Mr. Salvador Gilberto Ponce sought asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture. He had two theories of eligibility. His refusal to join the guerrillas and his belief in pacifism. I think we know what his theories are. Let me ask you about a different area than Judge Noonan was asking you about. He was asking you about whether the evidence introduced by the Petitioner could have compelled an opposite result. I want to ask you about a different subject, which is whether there was a legal error that was committed by the IJ which would compel a remand. The IJ said that because persecution is a threat to life and freedom, it's a close call as to whether country conditions rise to the level of persecution. I assume what he meant is whether the country conditions were such that there was a pattern and practice of persecution or whether homosexuality is a disfavored class. Although he didn't mention those subjects, he asked whether the conditions generally rose to the level of persecution. The definition of persecution is the infliction of suffering or harm in a way regarded as offensive, which seems to be a different standard than a threat to life and freedom. Now, if it was a close call with regard to a higher standard, doesn't that require us to remand in order to apply the proper standard and determine whether it is a pattern and practice or whether homosexuals are a disfavored group? No, Your Honor. This would not require remand. And the immigration judge sufficiently articulated the correct standards, especially by his use of citing to cases in this Court which, you know, if he used maybe alternative language in his decision, he cited the cases where the principles of what he was saying were very clear. Now, as far as pattern or practice in disfavored group, that has never been contended by the Petitioner. And so because it was not argued before the agency, this Court may not review those claims at this time. Well, it did argue before the agency that the controlling or applicable case was HOAXO or HOA, whatever, the Albanian. HOAX versus Ashcroft, yes. Which is a case that sets forth the sliding scale, depending on what the general conditions in the country are. Yes. And that's on page 65. And the immigration judge does cite to HOAXO for the principle that what he had suffered, his alleged mistreatment in El Salvador, did not rise to the level of persecution. And he did cite HOAXO for that. And that's because he was alleging only verbal harassment and emotional trauma. Opposing counsel cited to Mashiri in their brief to stand for the principle that this would stand for persecution. That case is materially distinguishable. If you look at that case, they're showing that there were not only death threats. There was violence to family members. There was vandalism. There was economic harm. There was emotional trauma. So, yes, under certain circumstances, threats or emotional trauma. I can't go from this decision whether homosexuals are a disfavored group or not. Well, he has never argued that they are a disfavored group. And so because that argument was never made to the agency, it has not been exhausted, and therefore this Court may not review it at this point. He argued only, well, first of all, this Court has found that homosexuality is a particular social group. So he has made that claim. So his claim of persecution is based on his political opinion, whether it be imputed or actual. That is his claim for political opinion and particular social group. So those are the claims before this Court. That's not really in his – in terms of – that may be in the past persecution. But in terms of future persecution, I think we're kind of splitting hairs here to say he didn't argue this. Well, what he has argued is country conditions. He hasn't argued – what he's argued is that the country conditions report show, I guess, sort of he is arguing essentially – he's not using the words pattern and practice. I understand that he's essentially getting at that. However, that's exactly why the country reports were insufficient. There was not a widespread violence or severe persecution of homosexuals. As Your Honor pointed out, there were only a few instances noted. And this is particularly critical. He says it's a close call when he applies – when he defines persecution as a threat to life and freedom. And he says because persecution is a threat to life and freedom, it's a close call. That's correct. The immigration judge reviewed all of the evidence. And at the end of it, he concluded that it was simply insufficient. And so the fact is he has the burden of compulsion in this case. He concluded it's a close call because of his definition. Well, he concluded it was – Persecution, which is a threat to life and freedom. Well, he concluded it was a close call because of the so-called mixed evidence, because on the one hand, you have this group of – And after he reviewed the mixed evidence, his conclusion is because persecution is, quote, a threat to life and freedom, it's a close call. Well, he was looking at the fact that what – Persecution isn't just a threat to life and freedom. Persecution is infliction of suffering or harm in a way regarded as offensive. That's a far lower standard than a threat to life and freedom. I don't think you can take that one sentence in isolation. Pardon me? I think his entire decision indicates where – I mean, you have to – the immigration judge is doing this as an oral decision, and so sometimes it's a little bit disjointed in terms of the order and the sequence in which the ideas are expressed in the decision. But throughout the decision, you can see that he's clearly expressing that he reviewed the evidence, and what was mixed about it was the fact that you have this gay rights group emerging, Entre Amigos, and so you have that. Pride parade taking place is on page 155, 159. You have the first gay pride parade in 2002, page 157, a liberal policy towards the gay community, page 163. He noted all of these things. You know what he didn't note was all the evidence put in in the news articles and otherwise that documents specific violence. So that to me was very troubling because that combined with the Human Rights Watch projects a picture here that's very different from what you might get in reading the I.J.'s oral decision. Right. Well, what he noted about, for example – Well, let me respond to that point. Why the Human Rights Watch materials plus all the other documented evidence doesn't give you at least a 10% chance of persecution based on sexual orientation? Because there were specific incidences mentioned, and to the extent that they tried to say that this was bigger or more organized or broader, it was unsupported. And so he notes that on page 67. For example, on page 198, one of the articles says, all these killings point to an organized campaign of death directed against gay men and transvestites in El Salvador. So the I.J. specifically notes that on page 67, that they're alleging this organized campaign that would suggest something bigger and broader. However, the I.J. then goes on to say, well, they didn't support this with anything. What are they basing this information on? It was sort of a blanket statement. And so he looks at the incidences where they actually go to describe particular situations. And in those cases, the rest of the evidence says, well, there does exist some killings. There does exist, you know, some harassment. There are instances of violence. How much do you need to get 10% if you've got people killing gays and transgender people? There is. That isn't 10%? I know we don't have exactly a parameter to judge this. Yes, there is no number. I think you have to look at whether there was sufficient objective evidence to conclude that there was, you know, an objectively reasonable fear. And the fact is that the police were providing protection to the Entre Amigos group. And this was, again, how it became sort of mixed, because on the one hand you have these threats, you have, you know, something along those lines. And then you have the police coming in and the government offering round-the-clock protection to this gay rights group. And so, therefore, you have this, you know, you can't say actually any torture, because if the government is attempting to protect the group, then there is no government actor involved. And these would be private individuals, therefore, that would be perpetrating isolated crimes. And that would certainly not be well-founded fear of persecution on account of a protected ground. And I just wanted to point out with the Bromfield that that is what's distinguishable, in that there was specifically saying a widespread violence. And that is used in the Bromfield decision of what the Department of State report was noticing. In this case, there is only incidences, existence and incidences of violence. And it's very important to note that. And especially you can see in the country report that's in the record, on page 213, for example, you can see in the next section when they're discussing a different group of people, they say was widespread and serious. And this is on page 213. When they're talking about the homosexuals, however, they use no such language. And that was the difference in Bromfield, which had to do with homosexuals in Jamaica. Again, the country report is the most compelling evidence, and it was his burden of proof. So if the picture is mixed, he failed to meet his burden of proof that the evidence compelled his conviction. It also depends on whether the immigration judge applies the incorrect standard. If so, we're required to reverse. So we may disagree on whether he his actual language was comparing actual instances of discrimination described in the reports with the extreme concept of persecution, that is to say a threat to one's life and freedom. It's a very close call as to whether the country conditions in the record regarding El Salvador rise to the level of persecution. So that's the question, whether when he made that conclusion, he was applying the right definition of persecution. All right. Thank you. Your time has expired. We've taken a lot of it.  We respectfully request that you deny the petition for review. Thank you. Thank you. One small point in rebuttal, Your Honor. As the court's questions point out, the immigration judge did apply the wrong standard. What he required of Mr. Ponce was a real chance of a threat to life or freedom. That's not the standard. The real chance language comes from the Board of Immigration Appeals decision in matter of Costa, which the Supreme Court in Cardozo versus Fonseca explicitly noted as part of the board's inconsistent approach to the standard governing eligibility for asylum. And as Your Honor pointed out, threat to life or freedom is much narrower than definition of persecution, which this court has consistently adopted. In fact, the immigration judge felt that under that higher incorrect standard, the record was a very close call as to whether Mr. Ponce established a well-founded fear of future persecution. So close, in fact, that he felt the need to say it four times in his opinion, that the picture is decidedly mixed. It's a mixed picture. It's a very close call. Under this standard, it's evident from the face of the record that Mr. Ponce has met his burden. The court should reverse the Board of Immigration Appeals decision. Thank you. Thank you, Your Honor. The case just argued is submitted.
judges: Reinhardt, Noonan, McKeown